1
2
3
4
5
6
7
8    **UNITED STATES DISTRICT COURT**
9    **SOUTHERN DISTRICT OF CALIFORNIA**

10
11   HANSEN BEVERAGE COMPANY, a
     Delaware corporation,
12                                    Plaintiff,
13
14
15        vs.
16
17
18   VITAL PHARMACEUTICAL, INC. aka
     VPX, a Florida corporation,
19
20                                   Defendant.
21
22

CASE NO. 08-CV-1545-IEG (POR)

**ORDER:**

**(1) DENYING HANSEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 109);**

**(2) GRANTING IN PART VITAL PHARMACEUTICAL'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (Doc. No. 107); and**

**(3) DENIES VITAL PHARMACEUTICAL'S MOTION FOR PARTIAL SUMMARY REGARDING DAMAGES AND OTHER MONETARY RELIEF (Doc. No. 108).**

23        Plaintiff Hansen Beverage Company ("Hansen") moves the Court for partial summary

24   judgment as to Defendant Vital Pharmaceutical, Inc.'s ("VPX") allegedly false advertising claim

25   that its energy shot product provides seven hours of energy.  (Doc. No. 109.)   VPX moves the

26   Court for summary judgment, or in the alternative, partial summary judgment, as to all of Hansen's

27   claims regarding its energy shot and other energy drinks.  (Doc. No. 107.)  VPX also moves the

28   Court for partial summary judgment regarding damages and other monetary relief. (Doc. No. 108.)

1   The parties have filed oppositions and replies as to each motion, in addition to evidentiary

2   objections.

3         A hearing was held on these motions on April 12, 2010.  After considering all the

4   arguments of the parties, for the reasons stated herein, the Court DENIES Hansen's motion for

5   partial summary judgment, GRANTS IN PART VPX's motion for partial summary judgment as to

6   certain advertising claims, and DENIES without prejudice VPX's motion for partial summary

7   judgment regarding damages.

8                     **<u>BACKGROUND</u>**

9         Hansen brings this action for false advertising, unfair competition, and trade libel against

10  VPX.  VPX and Hansen are competitors in the energy drink and energy shot markets.   Hansen

11  produces energy beverages including "Monster" energy drink and Hit Man energy shot.  VPX

12  produces an energy shot called Redline Power Rush! 7-Hour Energy Boost ("Power Rush"), and

13  energy drinks including Redline Extreme, Redline Princess, and Redline Ready-to-Drink.

14        Hansen filed the original Complaint on August 21, 2008, and VPX filed an answer.  (Doc.

15  Nos. 1, 24.)  On December 30, 2008, the Court denied Hansen's motion for a preliminary

16  injunction enjoining VPX from making claims that its product gives "7 Hours of Pure Energy," "7

17  Hours of Sustained Energy," and "No Crash."  (Doc. No. 33.)  The Court found several disputed

18  issues of fact including the definition of "energy," whether Power Rush can provide seven hours of

19  energy, and whether consuming Power Rush results in "no crash."

20        On April 17, 2009, Hansen filed a First Amended Complaint ("FAC") alleging three causes

21  of action: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) false

22  advertising and unfair competition in violation of California Business and Professions Code

23  Sections 17200 and 17500; and (3) trade libel.  (Doc. No. 44.)

24        On March 1, 2010, VPX filed a motion for summary judgment, or in the alternative, partial

25  summary judgment (Doc. No. 107), and a motion for partial judgment regarding damages and

26  other monetary relief (Doc. No. 108).  Hansen filed a motion for partial summary judgment, as to

27  VPX's advertising claim that Power Rush provides seven hours of energy.  (Doc. No. 109.)

28  Hansen and VPX both filed evidentiary objections and motions to strike affidavits.  (Doc. Nos.

1 | 115, 116, 120, 121.)

2 | **DISCUSSION**

3 | **I.      Legal Standard**

4 | Summary judgment is proper where the pleadings and materials demonstrate "there is no

5 | genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."

6 | Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material issue of

7 | fact is a question a trier of fact must answer to determine the rights of the parties under the

8 | applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute

9 | is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

10 | party." Id.

11 | The moving party bears "the initial responsibility of informing the district court of the basis

12 | for its motion." Celotex, 477 U.S. at 323. To satisfy this burden, the movant must demonstrate that

13 | no genuine issue of material fact exists for trial. Id. at 322. Where the moving party does not have

14 | the ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two

15 | ways: "The moving party may produce evidence negating an essential element of the nonmoving

16 | party's case, or, after suitable discovery, the moving party may show that the nonmoving party

17 | does not have enough evidence of an essential element of its claim or defense to carry its ultimate

18 | burden of persuasion at trial." Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106

19 | (9th Cir. 2000). To withstand a motion for summary judgment, the nonmovant must then show that

20 | there are genuine factual issues which can only be resolved by the trier of fact. Reese v. Jefferson

21 | Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). The nonmoving party may not rely on the

22 | pleadings alone, but must present specific facts creating a genuine issue of material fact through

23 | affidavits, depositions, or answers to interrogatories. Fed R. Civ. P. 56(e); Celotex, 477 U.S. at

24 | 324.

25 | The court must review the record as a whole and draw all reasonable inferences in favor of

26 | the nonmoving party. Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

27 | However, unsupported conjecture or conclusory statements are insufficient to defeat summary

28 | judgment. Id.; Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008). Moreover, the

court is not required "'to scour the record in search of a genuine issue of triable fact,'" Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (citations omitted), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

## II.   Cross-Motions for Summary Judgment

Hansen and VPX filed cross-motions for summary judgment as to VPX's allegedly false claim that Power Rush provides seven hours of energy.[1]  Because the parties base their falsity analyses on Lanham Act case law, the Court does the same.[2]

### A.   False Advertising Under the Lanham Act

There are five elements of a Lanham Act § 43(a) false advertising claim:"(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products."[3]   Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

---

[1]Hansen moves for partial summary judgment only as to the falsity elements (not causation and damages elements) of this claim.  (Pl.'s Mot. for. Summ. J. at 2 n.2, 3:1-11.)

[2]All three of Hansen's causes of action are based on VPX's allegedly false advertising.  VPX agrees that whether the claims are addressed with regard to a Lanham Act, California state law, or trade libel analysis, the result is the same.

[3]5Section 43(a) of the Lanham Act provides in pertinent part:
Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

1    "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that

2    the statement was literally false, either on its face or by necessary implication, or that the statement

3    was literally true but likely to mislead or confuse consumers." Id.  "When evaluating whether an

4    advertising claim is literally false, the claim must always be analyzed in its full context." Id.  A

5    false message is conveyed by necessary implication when, "considering the advertisement in its

6    entirety, the audience would recognize the claim as readily as if it had been explicitly stated."

7    Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d

8    578, 587 (3rd Cir. 2002).  If literal falsity is proved, the court will presume such literally false

9    statements actually mislead consumers.  See U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034,

10    1040-41 (9th Cir. 1986).  However, if an advertisement is not literally false, the plaintiff must

11    show that the advertisement has misled, confused, or deceived the consuming public, which is

12    typically tested through the use of consumer surveys.[4]  Southland Sod Farms,108 F.3d at 1140.

13        **B.    Evidentiary Objections and Motions to Strike**

14        The parties have filed numerous evidentiary objections.  The evidentiary objections beyond

15    those specifically addressed in this Order do not impact the substantive determination of the

16    merits, and the Court denies those objections as moot.

17        Hansen objects to the declaration of VPX's expert witness, Dr. Daniel E. Buffington,

18    because he is not qualified as an expert and VPX did not disclose all of the opinions and materials

19    he relies upon in the declaration.

20            1.    Dr. Buffington's Qualifications

21        Hansen contends that Dr. Buffington lacks the qualifications to render opinions on caffeine

22    and caffeine's effects on the human body.  The Court disagrees and finds Dr. Buffington has the

23    requisite knowledge, experience, training, and education to opine as to these matters.[5]   Among

24

25        [4]Hansen only argues literal falsity.

26        [5]Rule 702 of the Federal Rules of Evidence provides: "If scientific, technical, or other
27    specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in
     issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may
28    testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
     or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has
     applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

1    other qualifications, Dr. Buffington has a Doctor of Pharmacy degree, has over 25 years of work

2    experience teaching pharmacological effects of numerous agents, and has been qualified as an

3    expert to testify on the levels and effects of caffeine.  (Buffington Decl. ¶ 2; Buffington Dep., at

4    30-33.)  Importantly, Dr. Buffington has also completed a Clinical Pharmacokinetics Residency.

5    (Buffington Decl. ¶ 2.)  Pharmacokinetics describes the movement of a drug in the body, and

6    involves, among other things, clearance rate, half-life for elimination, plasma concentration, and

7    metabolism.  (Notice of Lodgment in Supp. of Hansen's Mot. for Partial Summ. J., Ex. K, Article

8    K1 ("Magkos").)[6]

9                      2.      Disclosure of Opinions and Materials

10           Rule 37(c)(1) of the Federal Rules of Civil Procedure imposes a sanction for failure to

11   comply with the disclosure rules: "If a party fails to provide information or identify a witness as

12   required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply

13   evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

14   harmless."[7]  Fed. R. Civ. P. 37(c)(1).  The burden is on the party facing sanctions to prove the

15   failure to disclose was substantially justified or harmless. Yeti By Molly, Ltd. v. Deckers Outdoor

16   Corp., 259 F.3d 1101, 1108 (9th Cir. 2001).

17           Hansen asserts that VPX did not disclose all the articles listed in Dr. Buffington's

18   declaration, either during discovery or in his expert reports, and therefore the information should

19   be excluded pursuant to Rule 37(c)(1).  However, because Hansen was aware of this information,

20   the Court finds nondisclosure was harmless.  Dr. Buffington found the additional studies after

21   submitting his expert reports, provided them to Hansen at his deposition on February 19, 2010, and

22   was specifically questioned about them at his deposition.  (Declaration of Kalina Pagano in Supp.

23   of VPX's Reply ("Pagano Decl."), Ex. C, Dep. of Dr. Buffington ("Buffington Dep.") at 47-48,

24

25           [6]F Magkos & SA Kavouras, Caffeine Use in Sports, Pharmacokinetics in Man, and Cellular
     Mechanisms of Action, Critical Reviews in Food Science and Nutrition, 45:535-562 (2005).

26

27           [7]A party is required to disclose expert testimony accompanied by a written report containing:
     "a complete statement of all opinions the witness will express and the basis and reasons for them" and
28   "the data or other information considered by the witness in forming them." Fed. R. Civ. P.
     26(a)(2)(B)(i-ii).  A party is further obligated to supplement information included in expert witness
     reports.  Fed. R. Civ. P. 26(e).

53-56; 97-98, 105-120.)  In addition, Hansen itself has included these studies as exhibits and discussed them thoroughly in its briefing.

Hansen also contends that Dr. Buffington's declaration contains new opinions regarding Power Rush, including calculations of the amount of caffeine remaining in the bloodstream after seven hours, and comparisons of the amount of caffeine in Power Rush to the amount of caffeine in a cup of coffee.  Although Dr. Buffington's declaration contains new illustrations of his previously disclosed theory, it does not contain new opinions.  Regardless, the Court finds any nondisclosure harmless because Hansen was aware of VPX's caffeine metabolism theory, and the illustrations relating to coffee do not impact the substantive determination of the merits.

### C.    VPX's 7-Hour Duration Claim

The Court must first determine what claims VPX makes with regard to Power Rush.  It is undisputed that VPX represents that one serving of Power Rush will provide seven hours of energy.  The name of the product includes the phrase "7-Hour Energy Boost," and VPX advertises Power Rush as providing "7 Hours of Sustained Energy" and "7 Hours of Pure Energy." (FAC ¶¶ 18, 20, 22.)  VPX's website also states that "the intense energy will last beyond your workout to keep you focused and energized throughout your day."[8]  (FAC ¶ 24.)

Contrary to Hansen's assertion, the Court finds VPX has not implicitly made a claim of comparative superiority over Hansen's products.  This claim does not appear on the face of Power Rush's name or advertising, nor is it necessarily implied.  In fact, at the time VPX launched Power Rush, Hansen had not yet produced its own Hitman energy shot.  (Declaration of John H. Owoc in Supp. of VPX's Mot. for Summ. J. ("Owoc Decl.") ¶¶ 9, 12.)

The Court also finds that VPX does not implicitly represent that its 7-hour duration claim is supported by product testing, which courts in other circuits have referred to as an "establishment claim."  The Ninth Circuit has distinguished between advertisements that explicitly or implicitly assert a claim based on product testing, which may be proven false by showing that the tests "'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made," and advertisements that make no such assertion, which must be proven false by

---

[8]VPX does not dispute that this also implies a durational claim of seven hours of energy.

affirmative evidence.  Southland Sod Farms,108 F.3d at 1139.  "An advertiser may make [an establishment claim] through the use of specific language, such as 'medically proven,' or through the use of visual representations."  Sterling Drug, Inc. v. FTC, 741 F.2d 1146, 1150 (9th Cir. 1984); see also McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir.1991) (advertisement which made a product superiority claim but "did not refer to clinical studies" was not an establishment claim); Ciba-Geigy Corp. v. Thompson Medical Co., 672 F. Supp. 679, 686 (S.D.N.Y. 1985) (comparative advertisement using a bar graph was an establishment claim).  But see W.L. Gore & Associates, Inc. v. Totes Inc., 788 F. Supp. 800, 809 (D. Del. 1992) (numerical comparison that rainsuits are seven times more breathable than the competitors' gives the impression of independent testing, and was not a claim of general superiority or mere puffing).

Because VPX does not expressly represent that the 7-hour duration claim is based on product testing, or implicitly make that claim through visual representations, Hansen must affirmatively prove that the claim is false.

### D.    Literal Falsity of VPX's 7-Hour Duration Claim

Hansen alleges that VPX's claim that one serving of Power Rush will provide seven hours of energy is literally false.  VPX argues, on the other hand, that there is enough caffeine in Power Rush to support its claim.  The parties present conflicting expert opinions and scientific studies on this issue.

Certain facts are not disputed.  It is undisputed that Power Rush contains 163 to 175 milligrams ("mg") of caffeine, depending on the flavor, and that Power Rush does not contain any sugars or carbohydrates.[9]  While the precise definition of "energy" is disputed, the parties' experts agree that caffeine provides energy, at least insofar as it increases wakefulness and alertness and helps avoid fatigue. The parties' experts also agree that caffeine is metabolized in a linear fashion at a rate expressed by the term "half-life," which is the length of time required for one-half of the circulating caffeine to be metabolized.  VPX's expert opines that the half-life range for caffeine is

---

[9]Power Rush also contains vitamin C, vitamins B-6 and B-12, folic acid, beta-alanine and phenylalanine, but VPX contends the caffeine alone is sufficient to support their claim.  (Buffington Decl.  4.)

1  1.5 to 12.4 hours, with an average half-life of about 6 hours (Buffington Decl. ¶ 10), while

2  Hansen's experts assert a lower half-life range of 3 to 5 hours.  Neither party purports to know the

3  minimum amount of caffeine below which there is no discernable effect.

4                  1.    VPX's Evidence

5        VPX primarily relies upon the declaration of its expert, Dr. Buffington, who bases his

6  opinion on third-party scientific literature on caffeine.  VPX has not conducted any tests

7  specifically on Power Rush.

8        Dr. Buffington opines that caffeine produces "feelings of energy" such as "mental

9  alertness, improved cognitive function, increased stamina, enhanced physical endurance, enhanced

10  performance, increased reaction time, wakefulness, absence of fatigue, mental focus, mood

11  elevation, or other feelings of being energized or avoiding drowsiness." (Buffington Decl. ¶ 6.)

12  According to Dr. Buffington, caffeine remains in the bloodstream seven hours after ingesting

13  Power Rush.  Using a half-life of six hours, and rounding down the amount of caffeine to 160 mg,

14  Dr. Buffington calculates that at seven hours there would be about 67 mg of caffeine in the

15  bloodstream.  (Buffington Decl. ¶ 12.)  Even using a half-life of four hours, at seven hours there

16  still would be about 50 mg of caffeine in the bloodstream. (Buffington Decl. ¶ 15.)   VPX argues

17  that, even assuming the 3-5 hour average half-life asserted by Hansen, and assuming equal

18  distribution at 3, 4 and 5 hours, 66% of the consumers will have individual half-lives of four hours

19  or more.

20        Dr. Buffington opines that studies have shown that energy effects have been observed at

21  doses of 50 mg of caffeine and less.  (Buffington Decl. ¶ 13.)  Dr. Buffington relies upon the

22  Childs study, which examined the effects of 0, 50, 150, and 450 mg of caffeine.[10]   (Notice of

23  Lodgment in Supp. of Hansen's Opp'n to VPX's Mot. for Summ. J. ("NOL"), Ex. 4 ("Childs").)

24  Childs noted that previous studies have shown that "as little as 30 mg of caffeine are detectible,

25  and can alter self-reports of mood and alertness, improve reaction times, and vigilance

26  performance" and that doses as low as 10 mg have been detected.  The results of the Childs study

27

28        [10]Emma Childs & Harriet de Wit, Subjective, behavioral, and physiological effects of acute caffeine in light, nondependent caffeine users (Psychopharmacology (2006) 185: 514-523).

showed a significant increase in "arousal" at 50 mg,[11] and "a small but significant increase in feelings of stimulation" at 50 mg.  Although Hansen's technical director, Dr. Davis, opines that the subjects taking the 50 mg dose did not experience significant differences on other subjective measures including "feel the drug" and "vigor," Hansen does not challenge the study's findings of significant increases in arousal and stimulation. (Davis Decl. ¶ 8.)

Dr. Buffington also relies upon the Griffiths study, which tested the discriminability of subjective effects of caffeine.[12]   (NOL, Ex. 5. ("Griffiths").)  During daily sessions, the subjects ingested two capsules sequentially, one with caffeine and the other a placebo, and attempted to identify which capsule contained caffeine, at progressively lower doses.  The result was that "[m]ore than half of the subjects significantly discriminated 18 mg of caffeine and one subject discriminated 10 mg." (Griffiths, at 976.)  Hansen argues that the study does not indicate what specific effect the subject was relying upon to determine he or she had consumed caffeine. However, the study indicates that all subjects considered dimensions of "alert" and "energy" to be either "moderately" or "very" important in discriminating between capsules. (Griffiths, at 974, 975 tbl 2.)

In addition, VPX points to statements by Hansen's own expert, Dr. Glenn Sipes, in support of its 7-hour duration claim.  Dr. Sipes stated that the average person should not have "any coffee after morning" if they do not want to be impaired falling asleep or staying asleep that evening, and that he did not know whether the amount of caffeine in a single serving of Power Rush would have an effect on an average person's ability to go to sleep or stay asleep seven hours after consumption.  (Sipes Dep., at 105:9-15; 106:6-9; 147:13-16, 20-21.)

Hansen argues that VPX's evidence does not support its 7-hour duration claim and that the claim is completely unsubstantiated.  The Court disagrees.  As VPX argues, it was not required to rely on studies which specifically tested energy levels at seven hours after ingestion of caffeine and tested actual concentrations of caffeine in the blood.  Hansen's experts do not dispute the

_____

[11]"Arousal" is a summary scale derived from the other scales: "arousal = (anxiety + vigor) - (fatigue + confusion)."  (Childs, at 516.)

[12]Roland R. Griffiths, et al., Low Dose Caffeine Discrimination in Humans, The Journal of Pharmacology and Experimental Therapeutics (1989).

scientific literature showing that caffeine is metabolized at a half-life rate, and that caffeine is completely absorbed from the stomach into the blood stream within approximately one hour after ingestion. (Magkos, at 538.) Because caffeine is the only relevant ingredient, VPX may rely on third-party literature regarding caffeine and caffeine metabolism.

Finally, Hansen also contends that VPX had no substantiation for its claim at the time it launched Power Rush. As Hansen argues, "claims which are unsubstantiated when made cannot be salvaged with after-the-fact clinical support." See Alpo Petfoods, Inc. v. Ralston Purina Co., 720 F. Supp 194, 205 n.12 (D.D.C. 1989), *rev'd in part on other grounds in* 913 F.2d 958 (D.C. Cir. 1990). However, VPX has presented evidence that it relied on third-party scientific literature on caffeine at the time it launched Power Rush. VPX's owner and CEO John Owoc states that he reviewed literature on the metabolism of caffeine before VPX introduced Power Rush.[13] (Owoc Decl. ¶¶ 2-8, 9, 12.) Although VPX's Chief Scientific Officer Dr. Jose Antonio acknowledged that he first gathered scientific support for the 7-hour duration claim, upon the request of Owoc, after the commencement of this lawsuit, Hansen has made no showing that this evidence was unavailable at the time VPX launched Power Rush. (NOL, Ex. E, Deposition of Dr. Jose Antonio ("Antonio Dep."), as 95:6-14.)

### 2.   Hansen's Evidence

Hansen argues that, even assuming VPX's broader definition of energy, it is entitled to summary judgment. Hansen relies on third-party scientific literature, as well as its expert's clinical trial on Power Rush.

Hansen provides the report of its expert, Dr. Sipes, wherein he conducted an analysis of the scientific literature. Dr. Sipes relies upon the Kaplan Study, which tested 0, 250, and 500 mg of

---

[13]Hansen contends that this is contradictory to Owoc's prior deposition testimony: Hansen asked Owoc to describe everything VPX did to substantiate the claim when first made, and Owoc responded that all VPX did was "[p]ut in four times the amount of caffeine" as the competing 5-Hour Energy shot and added glycerin. (Notice of Lodgment in Supp. of Hansen's Mot. for Partial Summ. J. ("NOL re Hansen's Mot.", Ex. B., Deposition of John H. Owoc Volume I ("Owoc Dep."), at 90:8, 91:1-12.) Hansen takes this statement out of context. Upon review of Owoc's statements, Owoc also informed Hansen that putting in four times the amount of caffeine was consistent with historical pharmacokinetic data and half-life and stated that "all the studies are real consistent on that." (Owoc Dep., at 90:8-20.)

caffeine.[14]  (NOL, Ex. 7. ("Kaplan").)  The subjects performed a Digit Symbol Substitution Test, used to assess "cognitive and motor performance," in which subjects had to make as many correct symbol-for-digit substitutions as possible within a 2-minute period.  (Kaplan, at 700.)  Dr. Sipes opined that the Kaplan study "suggests" that five hours after consuming a 250 mg dose of caffeine, subjects experienced "minimal, if any, positive cognitive effects" when compared to placebo. (Sipes Report, at 7-8.)  Dr. Sipes also relies upon the Bell Study, which examined the duration of caffeine's ergogenic (performance-enhancing) effect.[15]  (NOL, Ex. 7, "Bell").)  Dr. Sipes opined that the study found that, for regular caffeine users, "exercise endurance" six hours after consuming  350 mg of caffeine was no greater than placebo levels. (Sipes Report, at 12.)  Dr. Sipes concluded that, based on his review of the scientific literature, "it is difficult to support the claim that doses of caffeine of 250 mg or less result in meaningful, positive ergogenic effects that extend up to 5 hr."  (Sipes Report, at 8.)

In addition, Hansen provides the report of its kinesiology expert, Dr. Girandola, who was retained by Hansen to conduct a clinical trial on Power Rush.  (Girandola Decl., Ex.A, "Girandola Report.")  During separate sessions, the subjects consumed Power Rush and a placebo.  Four hours after ingestion, the subjects completed the following tests: Borg test (rating of perceived exertion), memory test, Profile of Mood States, and reaction/movement test.  Dr. Girandola concluded that the results showed no differences between any of the variables that were tested, and that Power Rush did not give the subjects energy after four hours.  (Girandola Report, at RG0000005.)

VPX argues that Hansen's evidence is insufficient to survive summary judgment. However, the Court cannot determine, as VPX argues, that bias and defects render Dr. Girandola's study so deficient that no reasonable jury could credit it.  According to VPX, Dr. Girandola concluded that there was a statistical lack of difference by averaging all 16 subjects together over all the measures.  VPX contends that the results of the study actually support VPX's claim, for example, that 10 of the 16 subjects gave positive subjective responses using words and phrases

[14]Kaplan et al., Dose Dependent pharmacokinetics and psychomotor effects on caffeine in humans, J. Clin. Pharmacol. 37:693-703 (1997).

[15]Bell, D., et al, Exercise Endurance I, 3, and 6 h After Caffeine Ingestion in Caffeine Users and Nonusers, J. Appl. Physiol. 93:1227-1234 (2002).

1  such as "energy," "jittery," "effect," "wired since he took drink," "slight boost" and "alert."

2  (Girandola Dep., Data Collection Sheets.)  However, these objections, as well as VPX's criticisms

3  of the Bell and Kaplan studies, go to the weight of the evidence.

4               3.     Conclusion

5        Both VPX and Hansen have presented evidence from which a reasonable juror could find

6  by a preponderance of the evidence that each is entitled to a verdict in its favor.  Because Hansen's

7  and VPX's materials demonstrate there is a genuine issue of material fact as to whether VPX's 7-

8  hour duration claim is literally false, the Court denies the cross-motions for summary judgment.

9  **III.    VPX's Motion for Summary Judgment, or Partial Summary Judgment**

10       VPX moves for summary judgment as to the remaining claims in Hansen's FAC, which

11  relate to VPX's non-durational advertising statements about Power Rush, Redline Xtreme, Redline

12  Princess, and Redline Ready-to-Drink.

13       **A.     "No Crash"**

14       Hansen alleges that VPX's claim of "No Crash" in its advertising for Power Rush is false

15  and misleading. (FAC ¶ 20.)

16       VPX claims that consuming Power Rush will result in "No Crash" for the consumer.[16]

17  Neither party contends that "crash" has a specialized scientific meaning.  VPX argues that "No

18  Crash" means no crash from sugar, while Hansen argues that it also means no crash from caffeine.

19  For the reasons set forth below, the Court finds that there is a genuine issue of material fact as to

20  whether the "No Crash" claim is literally false.[17]

21       The parties present conflicting expert opinions.  VPX relies upon the declaration of Dr.

22  Buffington, who opines that "No Crash" can be understood to mean no "crash" from sugar, i.e., the

23  ─────────────────────

24  [16] Hansen contends that VPX also implicitly represents that Hansen's products cause a crash.
    However, as VPX argues, this claim is not apparent on the face of the statement, and Hansen does not

25  present any evidence that this message is conveyed to consumers.  See Am. Home Products Corp. v.
    Johnson &  Johnson, 436 F. Supp. 785, 792 (S.D.N.Y. 1977) ("Consumer reaction is critical for

26  'determining whether an ad made false representations or used words tending to falsely represent the
    product in violation of [the Lanham Act].'").

27  [17] Hansen contends that Dr. Buffington's opinion about the "No Crash" claim was not

28  previously disclosed and should be excluded pursuant to Rule 37(c)(1).  Because the Court has
    concluded that VPX is not entitled to partial summary judgment, the Court finds any nondisclosure
    harmless.

1  rapid loss of energy and feelings of sluggishness that can occur after ingesting substances with

2  high sugar or carbohydrate content. (Buffington Decl., ¶ 19.)  Dr. Buffington opines that "No

3  Crash" is not literally false, because Power Rush does not contain sugar.  Dr. Buffington further

4  states that caffeine does not cause a "crash" because of the long and gradual metabolic clearance of

5  caffeine. (Buffington Decl., ¶ 19.)  On the other hand, Hansen's technical director, Dr. Davis,

6  opines that substantial scientific data exists showing that people often experience crash-like

7  symptoms following withdrawal from caffeine, such as headache, jitters, drowsiness, and nausea.

8  (Davis Decl. on Reply ¶ 5.)  Hansen further argues that Dr. Buffington acknowledges that caffeine

9  can cause headache and irritation.  (NOL Ex. 3, Buffington. Dep., at 63:24-64:25, 70:19-71:2.)

10       Because Hansen's evidence raises a genuine issue of fact as to whether VPX's "No Crash"

11  claim is false, the Court finds VPX is not entitled to partial summary judgment as to this claim.

12       **B.    "Amped to the max" and "ready to tear apart the weights and wear out the treadmill like a tiger released from its cage!"**

13
14       Hansen alleges VPX falsely represents in its advertising that Power Rush "will leave you

15  'amped' to the max in minutes, ready to tear apart the weights and wear out the treadmill like a

16  tiger released from its cage!"  (FAC ¶ 23.)

17       VPX asserts that the statement is mere puffery. "'Puffing' is exaggerated advertising,

18  blustering, and boasting upon which no reasonable buyer would rely and is not actionable under §

19  43(a)." Southland Sod, 108 F.3d at 1145. "While product superiority claims that are vague or

20  highly subjective often amount to nonactionable puffery, 'misdescriptions of specific or absolute

21  characteristics of a product are actionable.'" Id. "A specific and measurable advertisement claim

22  of product superiority based on product testing is not puffery." Id. The Court finds that this

23  statement is puffery and not actionable, because the statement constitutes exaggerated advertising,

24  blustering, and boasting upon which no reasonable buyer would rely.  Furthermore, the claim that

25  a consumer will be "amped to the max" and be able to "tear apart the weights" and "wear out the

26  treadmill" is not verifiable or measurable.[18]

27  ───────────────

28       [18]Even if the statement were not puffery, to the extent it may represent that Power Rush provides energy for physical activity, VPX would still be entitled to summary judgment.  Hansen relies solely on the declaration of its technical director, Dr. Davis, previously submitted in support of

1     Accordingly, the Court finds VPX is entitled to partial summary judgment as to this claim.

2     **C.      Claims Regarding Redline Xtreme**

3     Hansen alleges VPX falsely represents in its advertising that VPX's energy drink, Redline

4     Xtreme ("Xtreme"), is "university research proven" to deliver "a significant 7.5% improvement

5     reaction time," "a dramatic 13% increase in energy," and "an amazing 15% increase in focus," and

6     that it "dramatically enhances focus and energy."  (FAC ¶¶ 25, 26.)

7     VPX relies on Dr. Jay Hoffman's article about his study of the effects of Xtreme.[19]

8     (Hoffman Decl., Ex. 2 ("Hoffman").)  The study examined the effect of Xtreme on reaction time

9     and anaerobic power, and its effect on subjective feelings of energy, fatigue, alertness and focus.[20]

10    During different sessions, the subjects consumed either Xtreme or a placebo.  After a period of

11    exercise, the subjects were asked to complete a questionnaire rating their energy level, fatigue

12    level, feelings of alertness, and feelings of focus.  The subjects also performed a reaction test.  The

13    study results showed that average energy level and average focus was significantly higher for the

14    supplement than placebo,[21] and showed significant differences in reaction time.[22]  (Hoffman, at 4.)

15    Upon reviewing the results of the study, it appears VPX's claims of specific percentage

16    increases in focus, energy, and reaction time are accurate representations based on the study's

17    results.  Hansen presents no evidence in response, does not attack the study's findings, and does

18    not argue that VPX's advertising does not accurately reflect the study's findings.  Hansen's only

19    _____

20    Hansen's motion for preliminary injunction.  Dr. Davis opined that without calories Power Rush cannot provide energy in the form of the ability to do intense physical work.  However, Hansen fails

21    to address the substantial body of scientific literature showing that caffeine provides ergogenic effects. (See Magkos, at 537.)  Indeed, Hansen's expert Dr. Sipes states in his report that "caffeine may be an

22    ergogenic aid despite absence of caloric value."  (Sipes Report, at 1.)

      [19]Hansen argues that Dr. Hoffman's article should be excluded pursuant to 37(c)(1), but
23    provides no reason why. This article was properly disclosed and is admissible.

24    [20]J. Hoffman et al., Examination of a pre-exercise, high energy supplement on exercise performance,  Journal of the International Society of Sports Nutrition, 6:2 (2009).

25    [21]The subjects filled out the questionaire using the following verbal anchors: 1 = very low; 2
26    = low; 3 = average; 4 = high; 5 = very high.  The results for average energy level over three trials were: supplement ("SUP"), 3.5 ± 0.7; Placebo ("PL"), 3.1 ± 0.5.  The results for average feeling of
27    focus were: SUP, 3.8 ± 0.5; PL: 3.3 ± 0.7.  (Hoffman, at 5 tbl.1.)

28    [22]The results for reaction time (average number of hits) were: SUP: 56, PL: 52. (Hoffman, at 6 fig.3(a).)

1   argument is that Dr. Hoffman's and Dr. Buffington's declarations, which confirm that the

2   advertising accurately reflects the study's results, should be excluded.  However, the Court does

3   not rely on either expert's opinion.

4          Because Hansen has failed to show there is a genuine issue of fact as to the falsity of

5   VPX's advertising, the Court finds VPX is entitled to partial summary judgment as to this claim.

6          **D.      Claims Regarding Redline Princess**

7          Hansen alleges VPX falsely represents in its advertising that VPX's energy drink, Redline

8   Princess ("Princess"), provides "mood enhancement" and "appetite suppression," which is

9   "nothing short of euphoric." (FAC ¶¶ 28, 29.)

10         VPX relies solely on Dr. Buffington's declaration.  Dr. Buffington opines that caffeine and

11  other ingredients in Princess such as 5-hydroxy-L-tryptophan, beta-phenylalanine, St. John's wort,

12  yohimbine and hordenine (hordeum) have been shown to suppress appetite and enhance mood.[23]

13  (Buffington Decl., ¶ 24.)  Dr. Buffington opines that "euphoric" has no specialized scientific

14  meaning, but feelings of euphoria such as arousal, positive mood, and a "high" have been reported

15  as effects of caffeine. (Buffington Decl., ¶ 24.)

16         In response, Hansen submits Dr. Hoffman's study of Princess, which shows no mood

17  enhancement compared to placebo.[24] (NOL, Ex.10.)  Dr. Hoffman's study examined the

18  thermogenic effect of Princess on ten healthy and physically active female subjects.  During

19  different sessions, the subjects consumed either Princess or a placebo.  Dr. Hoffman concluded

20  that Princess did not alter mood significantly in these subjects.  VPX completely fails to address

21  Hoffman's study on Princess.  With respect to the appetite suppression claim, Hansen argues that

22  the St. John's wort study that Dr. Buffington relies upon actually concluded that St. John's wort can

23  be effective in treating symptoms of depression such as loss of appetite.  (NOL, Ex. 8.)

24         Because Hansen has shown there is a genuine issue of fact as to whether VPX's mood

25

26         [23]Hansen contends that this information should be excluded pursuant to Rule 37(c)(1) because Dr. Buffington's opinion is based on information from a source which was not disclosed in his expert reports. (Schierling Decl., ¶ 14.) However, any nondisclosure is harmless, because Hoffman's article,

27  submitted by Hansen, provides the same information.

28         [24]Hoffman, J., Thermogenic Effect of a High Energy, Pre-Exercise Supplement, Kinesiology, 40:207-213 (2008).

1  enhancement and appetite suppression claims are false, the Court finds VPX is not entitled to

2  partial summary judgment as to these claims.

3      **D.    Claims Regarding Sales Rankings**

4      Hansen alleges that three of VPX's advertising statements regarding its products' sales

5  rankings are false and misleading.

6      **1.    Ranked "#1 Energy Shot in Los Angeles"**

7      Hansen alleges VPX falsely represents that Power Rush is "The #1 Energy Shot in Los

8  Angeles." (FAC ¶ 31.) The advertisement at issue refers to June 28, 2008 AC Nielsen Data.

9  (Owoc Decl. ¶ 5, Ex. 1.)  VPX submits the June 28, 2008 AC Nielsen market report for energy

10  shots, which indicates Redline is ranked first in Los Angeles. (Droste Decl. ¶ 5, Ex. 3, C&G

11  (Convenience and Gas Station) Brand Rank - 9 Weeks Ending 06/28/08: Los Angeles - CTMM

12  Expansion.) The report shows Redline's sales totaling $107,069 in Los Angeles, and competitor

13  5-Hour Energy's sales at $103,155.

14      In response, Hansen submits a conflicting June 28, 2008 AC Nielsen market report for

15  energy shots, which shows 5-Hour Energy as ranked number one in Los Angeles. (NOL, Ex. 11,

16  C&G Brand Rank 9 Weeks Ending 06/28/08: Los Angeles-Scantrack Conv.) This report shows

17  5-Hour Energy's sales totaling $699,422 in Los Angeles and Redline's sales totaling $109,755. In

18  reply, VPX acknowledges that there are multiple AC Nielsen reports covering the same time

19  period, but argues that the specific report VPX relied on supports its claim. Neither party explains

20  what these different reports are meant to measure, nor attempt to explain the difference between

21  these numbers.

22      Because Hansen has shown that there is a genuine issue of material fact as to whether

23  VPX's claim that Power Rush is ranked first in Los Angeles is false, VPX is not entitled to partial

24  summary judgment as to this claim.

25      **2.    Ranked "sixth in San Francisco, Los Angeles and Phoenix and seventh in**

26          **Dallas"**

27      Hansen alleges VPX falsely represents that Redline was ranked "sixth in San Francisco,

Los Angeles and Phoenix and seventh in Dallas." (FAC ¶ 30.) The Redline energy drink

28  advertisement at issue refers to May 24, 2008 AC Nielsen market reports. (Owoc Decl., Ex. 1.)

1   VPX submits the May 24, 2008 market reports for San Francisco, Los Angeles, Phoenix and

2   Dallas, which confirm Redline's rankings as sixth and seventh in these cities.  (Owoc Decl. ¶ 4, Ex.

3   2, C&G Brand Rank W/O JAVA - 13 Weeks Ending 05/24/08.)

4           In response, Hansen contends that the "C&G" reports that VPX relies upon only provide

5   sales data for convenience stores and gas stations, and not sales data from the other two main retail

6   channels, drug stores and grocery stores.  (NOL, Ex. 12, Deposition of Rodney C. Sacks ("Sacks

7   Dep.") at 128:10-135:18.)  However, Hansen's own witness, Rodney C. Sacks, acknowledged that

8   "the principal category for energy drinks and energy shots in the U.S. which is probably at least 75

9   to 80 percent of the market is . . . C&G, convenience and gas stations."  (NOL, Ex. 12,

10  130:24-131:3.)

11          Hansen asks the Court to infer that if the market reports for drug stores and grocery stores

12  for San Francisco, Los Angeles, Phoenix and Dallas, which encompass 20-25% of the overall

13  market, were taken into account, Redline would be ranked lower than sixth and seventh in these

14  cities.  Hansen does not provide the Court with the actual market reports.  Unsupported conjecture

15  is insufficient to defeat summary judgment.  See Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107,

16  1112 (9th Cir. 2003).  This is not evidence such that a reasonable jury could find that VPX's

17  advertising statements are false.  See Anderson, 477 U.S. at 248.

18          Accordingly, the Court finds VPX is entitled to partial summary judgment as to this claim.

19                  3.       Claims Regarding Redline's Growth Rate

20          Finally, Hansen alleges VPX falsely represents Redline's growth rates in its advertising.

21  (FAC ¶ 30.)  VPX claims that "REDLINE is 'growing 16 times faster than the National Average

22  for Energy Drinks.'"  VPX submits the May 24, 2008 AC Nielsen market report for energy drinks,

23  which states that the "national average" for growth rate was 9.4%, while Redline's growth rate was

24  148.5%.  (Owoc Decl. ¶ 4, Ex. 2.)  This report supports the claim that Redline's growth rate is 16

25  times the national average, and Hansen presents no evidence in response.

26          VPX also claims Redline had "100 times the growth rate of REDBULL and MONSTER in

27  L.A."  VPX submits the May 24, 2008 AC Nielsen market report for Los Angeles, which indicates

28  Redline's sales had gone up 95% from sales during the prior month, in contrast to Red Bull and

1  Monster which were down in sales by negative 3.6% and negative 1.8%, respectively.  Again, this

2  report supports VPX's claim, and Hansen presents no evidence in response.

3       Therefore, VPX is entitled to partial summary judgment as to these claims.

4       **E.       Hansen's Trade Libel Cause of Action**

5       VPX argues that Hansen cannot meet its burden of satisfying the essential elements of the

6  trade libel cause of action.  VPX contends that Hansen cannot show that it made false or

7  disparaging statements about Hansen's products, which induced others not to deal with Hansen and

8  caused special damages.

9       Trade libel is defined as "an intentional disparagement of the quality of property, which

10  results in pecuniary damage." Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co., 838 F.2d 346,

11  351 (9th Cir. 1988) (quoting Erlich v. Etner, 224 Cal. App. 2d 69, 73 (1964)). A cause of action

12  for trade libel requires: (1) a publication, (2) which induces others not to deal with plaintiff, and

13  (3) special damages.  Aetna, 838 F.2d at 351.  The false and disparaging statements must be

14  "directed at . . . the goods a plaintiff sells or the character of his . . . business."  Id.

15       Hansen's cause of action for trade libel is based on VPX's advertising statements about

16  sales rankings, discussed in the previous section.[25]  (FAC ¶ 31.)   As to the specific claims on

17  which the Court granted VPX's motion for partial summary judgment, Hansen cannot maintain a

18  trade libel cause of action.  See ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1010

19  (2001) ("To constitute trade libel, a statement must be false.").  The only remaining claim with

20  respect to sales rankings is VPX's statement that Power Rush is "The #1 Energy Shot in Los

21  Angeles."  As VPX argues, Hansen has provided no evidence showing that consumers were

22  induced not to deal with Hansen because of the allegedly false statement, that the statement was

23  directed at Hansen's products, and that it caused Hansen to incur special damages.  The statement

24  does not expressly or implicitly refer to any of Hansen's products.  Importantly, Hansen's

25  conflicting market report for the Los Angeles area shows that 5-Hour Energy is ranked first in Los

26  _____

27       [25]On April 17, 2009, Hansen was granted leave to file the FAC, which added the trade libel cause of action.  Hansen's motion for leave to amend made clear that the trade libel cause of action was meant to address VPX's new advertisements about Redline's sales rankings, which were

28  published after the filing of the original Complaint.  (Hansen's Mot. for Leave to File FAC, at 1:4-6-22.)

1    Angeles, not Hansen.

2         In response, Hansen submits an expert report by Dr. Itamar Simonson, a consumer

3    behavior and marketing expert, who opines: "An energy drink presented as providing seven hours

4    of energy and no crash is likely to create the impression that a comparison energy drink that does

5    not promise such benefits is clearly inferior." (Declaration of Itamar Simonson in Supp. of

6    Hansen's Mot. for Partial Summ. J., Ex. A, Expert Report of Itamar Simonson, Ph.D. ("Simonson

7    Report"), at 10.)  However, this opinion is irrelevant to the issue of whether VPX's statement that

8    Power Rush is "The #1 Energy Shot in Los Angeles" constitutes trade libel.

9         VPX has shown that Hansen does not have sufficient evidence of the essential elements of

10   its trade libel cause of action to carry its ultimate burden of persuasion at trial.  Because VPX has

11   carried its initial burden, Hansen is required to produce evidence in response.  See Nissan Fire &

12   Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).  As discussed above, the

13   evidence that Hansen has presented does not create a genuine issue of material fact.  Therefore,

14   VPX is entitled to partial summary judgment on Hansen's trade libel cause of action.

15   **IV.     VPX's Motion for Partial Summary Judgment Regarding Damages and other
              Monetary Relief**

16
          VPX moves for partial summary judgment with regard to damages, on the grounds that
17
     Hansen presents no damages figures, no intended approach or methodology, and no conclusion
18
     about Hansen's damages.  Hansen's damages expert, Patrick Kennedy, states that his report is
19
     limited because, due to discovery disputes, VPX only recently turned over its financial information
20
     on March 3, 2010.  Kennedy is expected to prepare a supplemental report incorporating the
21
     information by April 6, 2010.  (Declaration of Patrick F. Kennedy, ¶ 1.)  In addition, no expert
22
     witness depositions regarding damages have been conducted.[26]
23
          Both parties request a continuance to a date after April 30, 2010 to allow for expert
24
     discovery.  Because the parties may find after additional discovery that there exist genuine issues
25
     of fact and summary judgment is not appropriate, the Court denies VPX's motion without
26
     prejudice to it being re-filed on or before May 31, 2010.  Should VPX re-file the motion, it will be
27

28         [26]The Court previously granted an extension to April 30, 2010 for the completion of expert
     discovery, but maintained the March 1, 2010 filing deadline for summary judgment motions.

heard on July 12, 2010 at 10:30 a.m., and the Court will issue an order continuing the Pretrial

Conference date, currently set for June 14, 2010.

## CONCLUSION

For the reasons set forth herein, the Court HEREBY ORDERS the following:

1.   The Court DENIES Hansen's motion for partial summary judgment.

2.   The Court GRANTS VPX's motion for partial summary judgment as to the following claims:

   a.   Power Rush makes you "amped' to the max in minutes, ready to tear apart the weights and wear out the treadmill like a tiger released from its cage!"

   b.   Xtreme is "university research proven" to deliver "a significant 7.5% improvement reaction time," "a dramatic 13% increase in energy," and "an amazing 15% increase in focus," and that it "dramatically enhances focus and energy."

   c.   Redline was ranked "sixth in San Francisco, Los Angeles and Phoenix and seventh in Dallas"

   d.   Redline is "growing 16 times faster than the National Average for Energy Drinks" and had "100 times the growth rate of REDBULL and MONSTER in L.A."

3.   The Court DENIES VPX's motion for partial summary judgment as to the following claims:

   a.   Power Rush provides seven hours of energy.

   b.   Power Rush results in "No Crash"

   c.   Power Rush is "The #1 Energy Shot in Los Angeles."

   d.   Princess provides "mood enhancement" and "appetite suppression," which is "nothing short of euphoric."

4.   The Court GRANTS VPX's motion for partial summary judgment on the trade libel cause of action.

5.      The Court DENIES VPX's motion for partial summary judgment on damages without

prejudice to it being re-filed **on or before May 31, 2010**.


        **IT IS SO ORDERED.**


**DATED:  April 27, 2010**

                                        **IRMA E. GONZÁLEZ, Chief Judge**
                                        **United States District Court**